Argued and submitted January 31, 2013, affirmed May 29, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SCOTT MICHAEL ASHKINS,
*Defendant-Appellant.*

Marion County Circuit Court
10C42610; A150038

327 P3d 1191

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson, LLP.

Michael Casper, Deputy Solicitor General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Assistant Attorney General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant appeals his convictions for first-degree rape (Count 1), ORS 163.375,[1] first-degree sodomy (Count 2), ORS 163.405,[2] and second-degree unlawful penetration (Count 3), ORS 163.408.[3] Defendant assigns error to the trial court's admission of hearsay statements made by the victim, contending that the state's notice of its intent to offer those statements did not meet the particularity requirements of OEC 803(18a)(b). We conclude that the state's notice was sufficient under OEC 803(18a)(b) and that, therefore, the trial court did not err in admitting the victim's hearsay statements. Defendant also assigns error to the trial court's decision not to instruct the jury that it must agree, under *State v. Boots*, 308 Or 371, 780 P2d 725 (1989), *cert den*, 510 US 1013 (1993), on which factual occurrence was the basis for each of the charges against him.[4] We conclude that the trial court's rejection of defendant's requested *Boots* instruction was not error. Accordingly, we affirm.

The undisputed facts relevant to our decision are as follows. In 2003, defendant married and began to live

[1] ORS 163.375(1) provides:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"(c) The victim is under 16 years of age and is the person's sibling, of the whole or half blood, the person's child or the person's spouse's child[.]"

[2] ORS 163.405(1) provides:

"A person who engages in deviate sexual intercourse with another person or causes another to engage in deviate sexual intercourse commits the crime of sodomy in the first degree if:

"(c) The victim is under 16 years of age and is the actor's brother or sister, of the whole or half blood, the son or daughter of the actor or the son or daughter of the actor's spouse[.]"

In turn, ORS 163.305(1) defines "deviate sexual intercourse" as "sexual conduct between persons consisting of contact between the sex organs of one person and the mouth or anus of another."

[3] ORS 163.408 provides, in part, that "a person commits the crime of unlawful sexual penetration in the second degree if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and the victim is under 14 years of age."

[4] We reject without discussion defendant's two remaining assignments of error, one, a challenge to the trial court's discretion to exclude evidence under OEC 403, and, the other, his assertion that the trial court failed to provide a less satisfactory evidence jury instruction.

with the victim's mother along with the victim, the victim's brother, and his own son. In 2009, the victim's mother reported to the Marion County Sheriff's Office that defendant had been "mentally, sexually, and physically abus[ing]" the victim repeatedly for the preceding four years. In February 2010, the victim, then 15 years old, told Detective Hingston that defendant had sexual intercourse with her in the bedroom, bathroom, kitchen, and living room of the family home. She also told Hingston that defendant had vaginally penetrated her eight times with a toy rocket and that she had performed oral sex on him approximately three times. Hingston recorded those statements in an investigative report submitted on February 18, 2010.

Shortly thereafter, defendant was indicted on one count each of rape in the first degree, sodomy in the first degree, and unlawful sexual penetration in the second degree.[5] Those counts in the indictment alleged that, on or between January 1, 2007 to March 23, 2010, the occasions of unlawful sexual contact occurred in Marion County when the victim was under the age of 16 for Counts 1 and 2, and under the age of 14 for Count 3. Count 3 specifically identified defendant's finger as the "object other than [his] penis or mouth" that unlawfully penetrated the victim ("to wit: his finger").

The state provided notice to defendant of its intent to rely at trial on statements made by the victim to a forensic interviewer and to Hingston. The notice provided, in part, that the state intended to rely at trial on hearsay statements made by the victim

"[t]o Detective Hingston from the Marion County Sheriff's Office on February 9, 2010. The statement is set forth in Detective Hingston's report submitted February 18, 2010 and is contained beginning on page 3 of the report and ending on page 5. The report was made previously available in discovery."[6]

---

[5] Defendant was also charged with unlawful use of a firearm, but that charge did not result in a conviction.

[6] The report also stated that the

"notice should be sufficient to give [defendant] proper notice of specifically which statements of the child victim [the state] intend[s] to offer as hearsay evidence at trial. If this notice is insufficient, and [defendant is] not sure of

At trial, defendant objected to Hingston's testimony about several statements the victim made to him about defendant's sexual conduct with her, arguing that the statements were hearsay and that they were not allowable under the child abuse exception to the hearsay rule, OEC 803(18a)(b), because the notice provided to him by the state did not "set out the particulars," as required by *State v. Chase*, 240 Or App 541, 248 P3d 432 (2011). The judge allowed Hingston to testify about what the victim had told him about defendant's actions toward her.

At trial, the victim testified about defendant's sexual conduct toward her in their home. The victim testified that defendant touched her in a sexual way "more than once" with his penis and fingers, and that those acts occurred "[s]ometimes on the couch[,]" "[s]ometimes on a table[,]" and "[s]ometimes in Mom and [defendant]'s—Mom's room." In response to questioning, the victim provided some detail about those locations—for example, that her autistic brother would be in his room engrossed in video games and that her mom would be at work when defendant would have sex with her on the kitchen table, during which defendant would pull off her clothes, and that she was too afraid to scream or yell for help. She also answered affirmatively to the state's question, "When [defendant] would put his penis in your vagina, did he ever use a lubricant?" The victim testified that when she was 11 or 12 years old, defendant would use his fingers to penetrate her "sometimes on the couch." She also testified that defendant would remain silent "when" he vaginally penetrated her with a red toy rocket. The victim also testified that defendant engaged in sodomy with her, saying that defendant "used to grab my hair and put my face on him, on his [penis]" and that he would have her put her face against

the exact statements [the state] intend[s] to offer, notify [the state prosecutor] by July 13, 2011 and [the state prosecutor] will ensure [defendant's] questions are answered and [defendant is] satisfied [he] know[s] which statements will be offered. If [the state prosecutor] do[es] not hear by July 13, 2011 that [defendant] believe[s] this notice is insufficient, [the state prosecutor] will consider it sufficient and will ask the Court to so find."

Because we conclude that the notice satisfied the particularity requirements of OEC 803(18a)(b), we need not address whether this part of the notice was a "courtesy," as argued by the state, or an improper shift of the burden to provide particularity to defendant, as argued by defendant.

his penis "most of the time." The victim did not identify any of those occurrences of sexual abuse by a specific date or time. Defendant, for his part, denied that any of the incidents of sexual contact took place.

Hingston testified that the victim had told him that defendant had sexual intercourse with her in the bedroom and bathroom, and on the kitchen table and the couch. According to Hingston, the victim had also told him that defendant had vaginally penetrated her eight times with a toy rocket and that she had performed oral sex on defendant about three times. He also testified that the victim had described defendant using baby oil as a lubricant before having sexual intercourse with her. Regarding the victim's statements, Hingston commented that "it was hard to get details from [the victim] and specifics" and that "it was real difficult for her to kind of capture what I was looking for and explain it." He noted, however, that "victims of continued abuse [when] it happens over a prolonged period of time, that a lot of times, you know, details get mixed up and—and—and everything kind of gets mooshed together."

The state sought to corroborate the victim's and Hingston's testimony about defendant's sexual abuse with evidence that, during the period of time that the charged offenses took place, defendant was "controlling" of the victim and her mother and that defendant acted in a sexually inappropriate manner around the victim. Defendant placed security cameras throughout the home, including cameras with a view of the victim's bedroom and the bedroom he shared with the victim's mother. Those cameras provided a continuous feed to a monitor in defendant's bedroom. The windows were sealed shut and the front door was deadbolted; the victim testified that she did not feel that she had freedom in her house. Additionally, there was a passcoded key lock on the door to the bedroom that defendant shared with the victim's mother, which would chime upon opening. Defendant kept the victim by his side constantly, often keeping her home from school, and the victim's mother testified that it was difficult to talk to her daughter because of defendant's interference. The victim's mother also testified that defendant had declared more than once that he intended to marry the victim. Defendant had also taken and uploaded

photos of the victim that included images of her breast and her pubic hair, as well as a photo of the victim eating a corn dog; the victim testified that defendant had taken the latter photo after urging her to "pretend like it's [defendant's penis] in your mouth."

At the close of defendant's trial, he requested that the trial court instruct the jury as follows:

"In order to reach a lawful guilty verdict as to any count, 10 jurors must agree on what factual occurrence constituted the crime. Thus, in this case, in order to reach a guilty verdict on any count, 10 jurors must agree on which factual occurrence constituted the offense."

The trial court declined that request, instead instructing the jury that, in order to establish the crimes charged, 10 of the 12 of them must agree that the state established beyond a reasonable doubt the elements indicated in the charges of the indictment. For Count 3, the instructions did not mention specifically defendant's finger as the object used for the unlawful penetration, as indicated in the indictment. Defendant took exception to those instructions, arguing that the jury was not asked "to necessarily agree on a specific act that constitutes the crime."

We begin with defendant's contention that the trial court erred in admitting the hearsay statements and review the trial court's determination that the state met OEC 803(18a)(b)'s notice requirements for legal error. *Chase*, 240 Or App at 546. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it is excluded from the definition of hearsay or falls under a hearsay exception. OEC 801; OEC 802. OEC 803(18a)(b) provides one of those exceptions for matters involving child abuse:

"A statement made by a person concerning an act of abuse as defined in * * * ORS 419B.005 [governing child abuse reporting] * * * is not excluded by [the rule against hearsay] if the declarant * * * testifies at the proceeding and is subject to cross-examination[.] * * * No statement may be admitted under this paragraph unless the proponent of the statement makes known to the adverse party the proponent's intention to offer the statement and the *particulars*

*of the statement* no later than 15 days before trial, except for good cause shown."

(Emphasis added.) The rule's purpose is to apprise an opposing party of the other party's proposed hearsay evidence so that it can have a reasonable opportunity to prepare for trial by developing other evidence, preparing for cross-examination if the declarant will testify at trial, filing a preliminary motion to limit use of the evidence, or modifying intended *voir dire. State v. Iverson*, 185 Or App 9, 14, 57 P3d 953 (2002), *rev den*, 335 Or 655 (2003). A trial court must exclude the offered hearsay statements if OEC 803(18a)(b)'s notice requirements are not met. *Id.* at 16.

Under OEC 803(18a)(b), the notice must provide details of the evidence that the party seeks to admit and list the particular statement sought to be admitted. *State v. Olsen*, 220 Or App 85, 89, 185 P3d 467 (2008). Although verbatim statements need not be included in the notice, "simply providing discovery and notice of an intention to offer at trial hearsay statements contained in discovery is not sufficient." *Chase*, 240 Or App at 546. The notice in *Chase*, which specified that "the foregoing and subsequent reports contain particulars of statements made by [the victim] that the State intends to offer[,]" did not sufficiently identify the specific hearsay statements that the state would offer at trial. *Id.* at 544, 546-47. We explained that the definition of a "'particular'"—"'an individual fact, point, circumstance, or detail *** specific item of information'"—could not be reconciled with the state's intention to potentially offer any of the statements included in the referenced discovery's 53 pages. *Id.* (quoting *Webster's Third New Int'l Dictionary* 1647 (unabridged ed 2002)). Instead, what is required for the "particulars of the statement" is that the proponent of the hearsay evidence identify in its notice (1) the proposed hearsay statement's substance and (2) the witness or means by which the hearsay statement would be introduced. *Id.* at 546-47.

We clarified those two particularity requirements in *State v. Riley*, 258 Or App 246, 256, 308 P3d 1080 (2013), where we concluded that a notice that referenced specific page numbers of discovery was sufficiently particular

because "the substance of the statements was readily identifiable." The state had identified in an affidavit attached to the notice "(1) the date on which the statements were made, (2) the place at which the statements were made, and (3) the specific discovery pages on which the statements themselves could be found." *Id.* In addition, the referenced pages of discovery included the identity of the particular witnesses to the statements, who we deemed could be available to testify at the trial about the statements' substance. *Id.* at 256 n 4 (*"Chase* does not stand for the proposition that a party is obliged to identify in its notice a *single* means of introducing a statement at trial. Rather, a party must identify the recipient(s) of the statement or other means by which it may be introduced at trial." (Emphasis in original.)).

Defendant relies primarily on *Chase* for his argument that the state failed to meet the requirements of OEC 803(18a)(b) because the notice's reference to Hingston's report did not provide "any 'particulars of any statement' or 'the substance of the victim's hearsay statements or how they would be offered' at trial." The state responds that the notice met the particularity requirement because it was not required to provide verbatim recital of the hearsay statements and that the notice included the date on which the statement was made, reference to a particular report, including the page numbers directing defendant to where in the report the statements could be found, and, by naming the detective in the report, an identification of the witness who would testify to the hearsay statements—all information, it contends, that was more specific than the notices we found lacking in *Chase* and *Olsen.*[7]

We agree with the state that the notice satisfied the particularity requirements of OEC 803(18a)(b). The notice provided the following particulars about the hearsay statements sought to be offered by the state and: (1) they were made by the victim, to Hingston, on February 9, 2010; (2) they were included in Hingston's report submitted on February 18, 2010, in pages three to five; and (3) the report

_____

[7] In *Olsen,* the notice indicated only that the state intended "'to offer child hearsay evidence pursuant to OEC 803(18a) and (24) at the trial.'" 220 Or App at 89.

was made available to defendant in discovery. That degree of detail contrasts significantly with the notice in *Chase*, which referenced "foregoing and subsequent reports" included in 53 pages of discovery without details about the statements sought to be offered or who would offer them. Here, the notice provided the date of the statements, and included to whom and by whom they were made, with specific enough detail regarding the statements' location in the report to allow defendant to discern their substance. Furthermore, the notice identified Hingston as the recipient of the statements, indicating that Hingston could be available to testify at trial, as he did for the grand jury. Accordingly, we reject defendant's contention that the trial court erred in admitting the evidence at issue.

We turn next to defendant's argument that the trial court erred when it rejected his requested jury instruction that "10 jurors must agree on which factual occurrence constituted" each offense. On appeal, defendant argues that, "[w]ithout instructing the jury that it had to agree on 'what factual occurence constituted the crime,' the court allowed individual jurors to pick-and-choose alleged incidents, without ever [e]nsuring that 10 jurors agreed that defendant's actions on a particular occurrence constituted each offense."

We review the trial court's failure to give a requested instruction for legal error. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). "Legal error occurs when the court refuses to give an instruction that correctly states the law * * * and is supported by evidence in the record viewed in the light most favorable to establishment of the facts necessary to require the instruction." *State v. Branch*, 208 Or App 286, 288, 144 P3d 1010 (2006) (citations omitted). As discussed below, defendant's proposed instruction does not follow from *Boots* and its progeny, and the trial court did not err in rejecting it.

We begin with a discussion of *Boots* to provide a context for our discussion of the offered instruction. In *Boots*, the defendant was charged with aggravated murder, which is a murder accompanied by one of 17 different factual circumstances. 308 Or at 373. The indictment in that case charged two "theories" for the aggravated murder charge—first, that

the defendant committed the murder during a first-degree robbery, and, second, that the defendant murdered the victim in order to conceal the identity of the perpetrators of the robbery. *Id.* at 374. The trial court instructed the jury that it did not have to agree unanimously on which of the two theories supported the aggravated murder charge. *Id.* at 374-75. Article I, section 11, of the Oregon Constitution requires that a unanimous jury must render a guilty verdict for the crime of first-degree murder and that 10 members of the jury must concur in rendering a guilty verdict for all other crimes. The question presented to the Supreme Court was whether, in light of Oregon's constitutional requirement of a unanimous verdict for first-degree murder, the jury could agree that an aggravating circumstance occurred without agreeing on which of the two factual theories offered by the state actually occurred. *Id.* at 374.

In concluding that the trial court's instruction was erroneous, the court reasoned that the two aggravating circumstances—robbery and concealing the perpetrator's identity—were not interchangeable; the circumstances of each element could be proved by different factual scenarios. *Id.* at 375. Moreover, the court noted that it is obvious that, if the charge of killing in furtherance of a robbery, or the charge of killing to conceal the identity of the perpetrators of a robbery, stood alone, the jury would have to agree unanimously on the factual circumstances that constituted each of those crimes. *Id.* at 377. The need for unanimity "should be no less obvious," the court stated, "when the state charges a defendant [under both of the aggravating circumstance subsections of ORS 163.095]." *Id.* The court, in line with its analysis that the different aggravating circumstances in each subsection of the statute implicated different factual theories, distinguished between facts that are mere "factual details" and facts that legally are "essential to a crime"; the former do not require juror unanimity or concurrence, and the latter do. *Id.* at 379.

In addition to its statutory analysis of the aggravated murder statute, the court looked to *United States v. Gipson*, 553 F2d 453 (5th Cir 1977), to support its holding. *Id.* at 380. In that case—also relied upon by defendant in

this case—the defendant was charged "as a person who 'receives, conceals, stores, barters, sells or disposes of' a stolen vehicle in interstate commerce[,]" and the trial court instructed the jury that it did not have to agree on which one of those acts the defendant had committed. *Id.* The Fifth Circuit remanded the case for a new trial, holding that the "[jury] unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *Gipson,* 553 F2d at 457-58.

Recently, the Oregon Supreme Court, in *State v. Pipkin,* 354 Or 513, 520, 316 P3d 255 (2013),[8] discussed the importance of *Gipson* as a basis for the requirement of a jury concurrence instruction as set forth in *Boots.* First, the court noted that the *Boots* holding requiring jury unanimity for each of the aggravating circumstances of ORS 163.095 was derived as a matter of legislative intent. *Id.* at 520. Second, the court pointed out that the *Boots* court considered *Gipson* "only to the extent that the court interpreted the aggravated murder statute to avoid 'constitutional doubts.'" *Id.* The *Pipkin* court identified those "constitutional doubts" as relating to the Sixth Amendment to the United States Constitution, not to Article I, section 11, of the Oregon Constitution, and stated that the difference mattered "because a majority of the United States Supreme Court later disagreed with the rationale in *Gipson.*" *Id.* (citing *Schad v. Arizona,* 501 US 624, 634-37, 111 S Ct 2491, 115 L Ed 2d 555 (1991) (plurality)). The court added that, in its view, "*Gipson* provides a poor basis from which to derive an independent analysis of the Oregon Constitution." *Id.* at 525.

In looking back on its case law since *Boots,* the Supreme Court in *Pipkin* identified two categories of cases in which a jury concurrence requirement has been addressed.

---

[8] *Pipkin* concerned the propriety of a jury concurrence instruction in the context of a charge of first-degree burglary, which occurs when a person "enters or remains unlawfully" in a dwelling "with an intent to commit a crime therein." ORS 164.225; ORS 164.215. The defendant's requested jury instruction provided that at least 10 jurors had to agree on whether the defendant either entered the dwelling unlawfully or remained unlawfully in the dwelling, or did both. 354 Or at 515-16.

The first, which is represented by *Boots* itself, is the situation where a criminal statute specifies alternative means of committing a crime.[9] 354 Or at 516. The second category of cases involves situations where "the record discloses multiple separate occurrences of the charged crime." *Pipkin*, 354 Or at 525 (citing *State v. Lotches*, 331 Or 455, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001), and *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004)); *see also State v. Sparks*, 336 Or 298, 83 P3d 304 (2004). Because this case falls into that second category of cases, we review how the jury concurrence requirement has been addressed in those cases in order to evaluate the appropriateness of defendant's proposed jury instruction.

In *Lotches*, the defendant was charged with, among other crimes, multiple counts of aggravated murder involving different victims. On plain error review, the court addressed whether *Boots* applied when the instructions did not specify which of multiple factual occurrences adduced at trial supported the underlying felonies for the aggravated murder charges. 331 Or at 467-69. The jury concurrence problem arose because, for each count, the evidence permitted the jury to find multiple occurrences of each predicate crime, such as attempts to steal both a car and a pick-up truck from different victims. *Id.* at 470-71. More than one occurrence could have supported the underlying aggravated murder felony offense of attempted first-degree robbery, yet the trial court did not instruct the jury that they had to agree on which specific occurrence constituted attempted robbery. *Id.* at 467-71.

The court relied on *Boots* and *Gipson* as support for its holding that a jury concurrence instruction was required. *Id.* at 467-69. The court stated that, "because the aggravated

---

[9] Another example of that situation is *State v. King*, 316 Or 437, 852 P2d 190 (1993). There, the court held that a jury concurrence instruction was not required where the defendant was charged with driving under the influence of intoxicants, which under the then-extant version of ORS 813.010(1) was committed when, as pertinent to that case, a person drove a vehicle while the person "(a) [had] .08 percent or more by weight of alcohol in the blood;" or "(b) [was] under the influence of intoxicating liquor or a controlled substance[.]" The court concluded that paragraphs (a) and (b) were not essential elements of separate offenses, as was in the case in *Boots*, but were alternative methods of proving a single offense. *Id.* at 446.

murder instructions that were given did not either limit the jury's consideration to a specified underlying felony or require jury unanimity concerning a choice among alternative felonies, each instruction carried the same danger that this court had condemned in *Boots*." *Id.* at 469. Additionally, *Lotches* called attention to the *Boots* court's approval of *Gipson* as a basis for requiring a jury concurrence instruction, also quoting that decision: "'*The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged.*'" *Id.* at 468 (quoting *Gipson*, 553 F2d at 455-56) (emphasis in *Lotches*).

In *Hale*, also a plain error case, the defendant was charged with aggravated murder with the underlying circumstances of third-degree sexual abuse and murder. There were, however, multiple possible perpetrators and victims for the underlying crimes. 335 Or at 627. The court, applying the reasoning of *Lotches*, held that,

> "because the instructions that the jury was given with respect to each of the aggravated murder counts based on the crimes of third-degree sexual abuse and murder did not either limit the jury's consideration to a specific instance of third-degree sexual abuse or murder, committed by a particular perpetrator against a particular victim, or require jury unanimity concerning a choice among alternative scenarios, each instruction carried an impermissible danger of jury confusion as to the crime underlying each count."

*Id.* The court concluded that the trial court's failure to require jury unanimity when there were different possible victims and perpetrators of the underlying counts was plain error. *Id.* As it had in *Boots* and *Lotches*, the court in *Hale* again referred to *Gipson* for support, stating that the unanimous jury rule "requires that the jury agree as to *just what the defendant did* to bring himself within the purview of the particular [offense] under which he was charged." *Id.* (emphasis added). However, given that the court in *Pipkin* has now clarified that *Gipson* is no longer a valid basis for the category of jury concurrence instruction cases represented by *Boots* and *King*, it is doubtful that *Gipson* still can serve as a basis for the second category of cases represented by *Lotches*, *Hale*, and this case. What survives is

the Supreme Court's concern, based on Article I, section 11, regarding the need for jury concurrence as to essential facts and regarding an impermissible danger of jury confusion.

Finally, in *Sparks*, the court concluded that the trial court's failure to provide a *Boots* instruction was not plain error because the facts did not implicate the same concerns identified in *Lotches*.[10] 336 Or at 316-17. There, the defendant, who had been convicted of aggravated murder, argued that the evidence that the underlying crimes could have taken place in the defendant's bedroom or at the location where the victim's body was found (a railway embankment) likely confused the jury because it could have found him guilty based on either of those factual circumstances. *Id.* at 313. The court distinguished the facts of the case from *Lotches* and *Hale*:

> "In *Lotches,* there were multiple possible victims for each of the underlying crimes. Similarly, in *Hale,* there were multiple possible victims and two possible perpetrators of each of the underlying crimes. In both of those cases, the jury was presented with multiple factual theories for each of the underlying crimes. It is not reasonably in dispute that a jury's failure to agree unanimously on either *the victim* or *the perpetrator* of the crime would violate the jury unanimity rule, because both those facts are material elements of the underlying crimes."

*Id.* at 316 (emphases in original). The defendant did not provide an explanation of why the location was "essential to the crime" and not a "factual detail," and the court, therefore, held that it was not "obvious" that "the precise location of the underlying crimes constitutes a material element of those crimes on which the jury must agree unanimously. *Id.* at 317. In fact, the location of those crimes more logically constitutes a 'factual detail' that does not require jury unanimity. *Boots*, 308 Or at 379." *Id.*

Two of our cases also bear on the analysis of whether a jury concurrence instruction is necessary in circumstances

---

[10] "The elements of plain error are: the error must be one of law; (2) the legal point must be obvious, that is, not reasonably in dispute; and (3) to reach the error, '[w]e need not go outside the record or choose between competing inferences to find it[.]'" *Sparks*, 336 Or at 315 (quoting *Brown*, 310 Or at 355).

such as these. *State v. Garcia*, 211 Or App 290, 295, 154 P3d 730, *rev den*, 343 Or 160 (2007), involved a defendant who was charged with multiple sex offenses involving a child victim. In that case, as here, the victim testified in very general terms about the approximate number of times the abuse took place in various rooms of the house over the course of several years. *Id.* at 293-94. We held that the failure to give a jury concurrence instruction was not plain error under those circumstances, because we were unable to discern any plausible reason why a jury might have credited the victim's generalized testimony with regard to one incident versus another. *Id.* at 297. Likewise, in *State v. Pervish*, 202 Or App 442, 123 P3d 285 (2005), *rev den*, 340 Or 308 (2006), which involved a defendant charged with multiple counts of promoting prostitution, we rejected the argument that the need for a concurrence instruction was apparent on the face of the record, explaining that "[t]he very generality of the evidence pertaining to [the charge of promoting prostitution] ameliorated any risk that members of the jury could have picked different factual incidents in convicting defendant of that charge." *Id.* at 463.

We return to the issue presented in this case: whether it was error for the trial court to decline to instruct the jury that it had to agree on which factual occurrence constituted each of the crimes charged, where, for each, "the evidence permit[ted] the jury to find multiple, separate occurrences of that crime." *See Pipkin*, 354 Or at 517. *Lotches*, *Hale*, and *Sparks* teach that, when the record supports the possibility of more than one occurrence of the crime charged, the court must give a jury concurrence instruction if (1) the occurrences differ as to some factual element—such as the identities of the victim or the perpetrator—that is material or, as described in *Boots*, "essential to the crime," and (2) the instruction is necessary to avoid causing an "impermissible danger of jury confusion." *Hale*, 335 Or at 627; *see Lotches*, 331 Or at 467-71. Neither concern is implicated where the evidence suggests that the crime was committed on multiple occasions but does not provide the jurors with enough specifics to distinguish one occasion from another in a way that would allow them to draw conflicting conclusions regarding

the crime committed. That is particularly true where factual distinctions between different instances are not contested.

Here, defendant has not explained why the evidence of multiple instances of sexual abuse by defendant involves factual differences that are "essential to the crime" or cause an "impermissible danger of jury confusion." As to Count 1, first-degree rape, the victim testified that she was raped "[s]ometimes on the couch. Sometimes on a table. Sometimes in [her mother's] room." Defendant fails to make any argument that the location of the rape for which he was convicted is an essential fact, nor was the evidence sufficiently distinct to allow the jurors to distinguish various instances from each other. For Count 2, the victim described incidents of sodomy in general terms, and Hingston testified that the victim told him that the defendant had the victim engage in oral sex "approximately three times" or "used to grab [her] hair and put [her] face on him, on his [penis]." Defendant does not point to any differences among those incidents that are essential to the crime or could cause juror confusion. Finally, for Count 3, second-degree unlawful penetration, the victim and Hingston testified that the finger penetration with which defendant was charged occurred "sometimes."[11] Again, there are no distinguishing details among the penetration incidents that require an instruction to avoid an impermissible danger of juror confusion. As to all counts, defendant denied that any of the described incidents occurred at all. As in *Sparks* and *Garcia*, a jury concurrence instruction is not required as to the precise location or circumstances of defendant's various acts of abuse.

---

[11] Defendant does not assert that the trial court's failure to identify in the instructions that defendant's finger was the object used for the unlawful penetration was erroneous where both the indictment and the prosecutor's arguments identified defendant's finger as the penetration object. Under *State v. Pauley*, 211 Or App 674, 686, 156 P3d 128 (2007), we held that, even though the trial court's instructions did not identify the victim's vagina as the area of sexual contact for the crime of attempted first-degree sexual abuse, the trial court, whose duty it is to instruct the jury on the law, properly provided the jury with the necessary elements of the offense. Likewise here, the indictment and the prosecutor's statements made clear that the object of penetration for Count 3 was defendant's finger. Because the trial court correctly provided in its jury instruction the elements to prove unlawful penetration, the prosecutor's statements were sufficient to make the jury aware that the penetration object was defendant's finger and not the toy rocket.

To summarize, when the evidence supports multiple, separate occurrences for a single offense but does not provide the jurors with enough specifics to distinguish one occasion from another in a way that would allow them to draw conflicting conclusions regarding the crime committed, a jury instruction requiring concurrence as to which factual occurrence constituted the crime charged is not required. The factual details suggesting separate incidents of the crimes in this case were not of the type—such as the identity of the victim or the perpetrator—that have been held to be material facts requiring jury concurrence, and those details did not create an impermissible risk that the jury would be confused in distinguishing one occasion from another or would draw conflicting conclusions regarding the crime committed. Therefore, the trial court did not err by refusing to give defendant's instruction because the instruction did not correctly state the law as applied to the evidence in this case.

Affirmed.